311-0833, people of the state of Bellevue County Police, Garrick Nandesinak, First, Daniel Belknap, defendant, by Andrew Boyd. Mr. Boyd? Gnidovic. Mr. Boyd, good morning. Andy Boyd from the State Appellate Defender's Office on behalf of defendant Daniel Belknap. In this case, Mr. Belknap was originally charged with first-degree murder and endangering the life of a child in connection with the death of five-year-old Sylvain Yolke. He was convicted on both counts following a jury trial. This honorable court reversed that decision and remanded for a new trial, finding that the trial court failed to strictly comply with Supreme Court Rule 431B and that this failure prejudiced Mr. Belknap because the evidence in that case was closely balanced. In August of 2011, this case proceeded to a second jury trial on only the first-degree murder charge. Mr. Belknap was convicted again and was sentenced to 24 years in prison. And this is the direct appeal of that conviction. Your Honors, we presented three arguments in this appeal. The first argument is that there was insufficient evidence to convict. The second argument is that the trial court's failure to ask the jurors whether they understood the Rule 431B principles was both error and prejudicial to Mr. Belknap because the evidence was closely balanced. Our third argument is that the prosecutors directing the jury's attention away from the elements of the crime by evoking sympathy for the victim was both error and prejudicial to Mr. Belknap, again, because the evidence was closely balanced. At a minimum, Your Honors, we would ask that the court determine, as far as the 431B issue, that the result in this case is controlled by this honorable court's decision the first time around. In that case, this court determined that there was a 431B error and that the error was prejudicial because the evidence was closely balanced. Here again, we've got a 431B issue. We've got virtually the same evidence presented in the second trial. And we would ask that Your Honors, at a minimum, determine that the evidence was closely balanced. We would also ask that Your Honors find that this evidence is entirely insufficient. But at a minimum, we would ask that this case be remanded for a new trial on the 431B issue. As far as our first argument, the reasonable doubt issue, we acknowledge that this honorable court, the first time around, found that the evidence was sufficient to convict Mr. Belknap. And we also do acknowledge that there's a very high standard for reviewing sufficiency of the evidence arguments. What we argue is that in this case, there was insufficient evidence to convict Mr. Belknap because the only direct evidence implicating him was the testimony of the two jailhouse snitches. And both of these individuals had a great deal of motivation to testify falsely. And we would concede that the credibility of an informant, the case law says, is generally a matter for the jury. In this case, though, we point out that this was a jury that, number one, was not properly law-adhered. This jury was not asked whether they understood some very basic and fundamental principles of law that are articulated in the 431B principles. And this was also a jury that was exposed to statements and arguments by the prosecutor that did nothing other than to inject emotion and sympathy into their deliberations. So that's the reason that this court, in this particular case, can't simply defer the judgments to the jury's determination as to the credibility of these informants. These problems, the 431B problem and the problem with the prosecutors injecting emotion and sympathy into the arguments could have played into the jury's determination of the credibility of these jailhouse snitches. And in particular, we emphasize the prosecutor's statements in closing arguments. And these statements asking the jury to enter into a sympathetic relationship with the victim served no other purpose other than to cloud the jury's analysis. This was a jury that was charged, like every jury is, with dispassionately analyzing the facts in the case, including, most importantly, the credibility of these jailhouse snitches. And the jury had been exposed to a heavy dose of emotional statements designed to inflame their passions, and this certainly could have influenced their determination as to the credibility of these individuals. Your Honors, this case basically came down to whether the jury believed the testimony of these snitches, Joseph Burgess and Jeffrey Ahlers. We direct the court's attention, as we did in our brief, to the Rivera case. We believe this case is directly on point for a number of different reasons. The basic thing that this Rivera case stands for, Your Honors, is that a jury's determination as to the credibility of jailhouse informants is not and cannot be the end of the story. The Rivera court correctly determined that jailhouse snitch testimony should be treated with a great deal of caution. There's a number of very important similarities between the Rivera case and this case that I'd like to point out for Your Honors. In Rivera, we have two jailhouse snitches testifying in separate trials that the defendant confessed that he killed the victim. In this case, we also have two jailhouse snitches testifying that the defendant confessed that he killed the victim. In Rivera, these jailhouse informants were effectively cross-examined by defense counsel, which exposed these informants' motivation to testify falsely. In this case, we also had an effective cross-examination by defense counsel, which exposed Burgess and Ahlers' motivation to testify falsely. I'll get into that in a little more detail in just a second. In Rivera, just like the Instant Case, there wasn't any pre-trial hearing as to whether these snitches were reliable or not. Those hearings only occur in capital cases. This was not a capital case. Now, what happened as far as the credibility of these individuals, in Burgess' case, he was exposed. He was accused of very serious crimes, including aggravated arson, which could have exposed him to class-X sentencing. He could have been exposed to up to a 30-year sentence. He testified that the initial offer that he received was 22 years, and he also testified that he ultimately received an eight-year sentence. That's a 14-year reduction in his plea offer. That is, Your Honor, to put it bluntly, a very, very sweet deal that Mr. Burgess received. In Mr. Ahlers' case, he had a number of charges, a number of charges in various counties that were dropped. He testified these charges were dropped. He testified that he received four-year concurrent sentences. It was possible he could have received a consecutive sentence, perhaps even an extended term on these offenses. Mr. Ahlers testified, essentially, Your Honor, that he's a professional liar. The vast majority of his convictions are for things like fraudulent conduct and deceptive conduct. Jeffrey Ahlers is simply not a credible witness. Were these points brought out to the jury's attention, though? Yes, Your Honor. They certainly were. And that's the point I'm trying to make, is that in this case, as in the Rivera case, there was an effective cross-examination, and the jury should not have accepted at face value this testimony because of their, frankly, their very clear and obvious motive to testify falsely. Another similarity between this case and the Rivera case is that the State, in this case, didn't make any effort to verify, independently verify the claims that were made by these individuals. And if the State had done so, they would have found out that there wasn't any DARE officer that had spoken to the victim in this case. The victim in this case had not been punched in the face, as Mr. Ahlers claimed, and that Mr. Burgess' assertion that he and Mr. Belknap had made hooch in jail could not have been true. It simply could not have been true. It was testimony by one of the jail guards that these cells were inspected on a daily basis. There's no way in the world that Mr. Burgess and Mr. Belknap were making hooch in that cell. That simply did not happen. But again, the jury in this trial, the second trial, learned about that. There were these additional witnesses that testified that the first jury had that additional defense information and still convicted him. They did, Your Honor. But we point out that there are two problems with this jury. Number one, this jury was not properly vaudeered. Number two, this jury was exposed to very strong arguments pointing away from the elements of the crime and inviting the jury to enter into some sort of sympathetic relationship with the victim. So we have a jury, Your Honor, we submit that went back to filled with emotion, so to speak. Filled with emotion and sympathy for the victim and not able to take a dispassionate look at the credibility of these witnesses. In a case like this, you'd have to be filled with emotion, wouldn't you? This is a very tragic case. This is a horrendous case, Your Honor. This is an absolutely horrendous case, of course. The jury may well have had some emotion regardless of what the prosecutor did or did not say. But the prosecutor pushed all the buttons that he could push in order to amp up the jury's sympathy for this victim. And that, respectfully, Your Honor, is why we think this is one of those cases where this court can say that these jailhouse witnesses were not credible and take a deeper look past simply saying, well, and I do understand that the credibility of jailhouse informants is a matter for the jury. But in this particular case, because it did start out, as Your Honor correctly points out, as a very emotional case to begin with, the prosecutor pushed all the emotional buttons. We have a jury who was likely not taking a dispassionate look at the credibility of these witnesses. And that's... All three issues that you raise are inevitably bound together? I'm not sure I'd go that far, Your Honor. I think that the second and third issues that we raise can inform Your Honor's consideration and this court's consideration of the first issue. The fact that the jury wasn't properly wide-eared, the fact that the prosecutor improperly questioned into this case can inform Your Honor's determination as to whether these individuals were credible witnesses or whether the jury properly determined that they were credible witnesses. So I don't necessarily say that all these issues are inexplicably bound. I wouldn't go quite that far. I would say that the second and third issues play into the first issue. Following up on Justice Litton's question, as I understand it, you're claiming that the evidence wasn't sufficient to prove his guilt beyond a reasonable doubt now in this appeal. And you want us to consider the facts that the jury didn't get in the first appeal, and that is know who to know there. Is there any other evidence that supports the defense in the second trial that would weaken the State's case more? Because we have... Justice Carter wrote the first decision. We have the determination of the first panel that substantially the same evidence was sufficient. So the hooch and the dare officer is additional evidence. Is there anything else in the record? I cannot recall anything off the top of my head that would be additional or different in this case. Okay. And then the other difference in this case is there's a closing argument issue that was not present in the first case. Yes. That's correct. With respect to the 431B issue, I have to speak on behalf of the court that we're astounded that the prosecution would repeat the same error after a conviction for murdering a five-year-old child, was she? Yes, a five-year-old. Is reversed and remanded because the jury was improperly impaneled by the first judge. It goes back for a new trial. And the prosecutor doesn't guide the court to avoid the very same error. But now, in the second appeal, my concern is the error in impaneling the jury, which should have never occurred, I will say that personally, isn't it cured once at the conclusion of the evidence the court properly instructs the jury as to all the Zare principles formally? No, Your Honor, I don't think so. I think the Supreme Court rule 431B is crystal clear that these acknowledgements have to be given, that the Thompson decision is crystal clear, as is the Wilmington decision, that the failure to ask whether they both understand and accept these 431B principles is error. And I don't think that's cured by simply a recital of those principles during the jury instructions. And if I recall correctly, in the first case, the problem with the 431B principles was that the jury was not given a chance to respond to those questions. The principles were stated to the jury, but the jury was not given the chance to respond. No, Your Honor, that is not cured. Let me ask you to visit plain error, because we think of the plain error test now as having two prongs. One, when the case is closely balanced, something automatic goes back. And then the second prong is substantial injustice. Let's focus on the second prong, not closely balanced, but the second prong, whether there's been a miscarriage of justice here. How did the 431 weaknesses in this trial, the second trial, compromise the jury's deliberation? Because I don't see anything in your briefs or this record to suggest that the jury did not follow the judge's instruction. You're correct, Your Honor. We focused our arguments on the first prong of the plain error analysis. How was that different? As far as the second prong. Maybe this is where the cumulative error comes in. These principles are incredibly important principles. There's nothing more important for a jury than heading back into that deliberation room, understanding that the state has to prove the case behind a reasonable doubt. Aren't your arguments on the second prong pretty well already decided by the Thompson case? In the second prong area, Justice Kilbride, writing for the court, said that they're not going to have a bright-line test, and they found a 431B violation, and they said that it wasn't a structural error. Your Honor is absolutely correct, and that's why we focused our arguments on the first prong. So you'd have a hard time standing before us and arguing that it'd be a structural error, wouldn't you? I would, and in fact, that's why we argued the first prong. And as far as that first prong. How can a procedural error like this, which is not an evidentiary error, I mean, I understand that the court excludes evidence that should have been admitted in favor of the defense, how that could tip the scales of justice in a closely balanced case. But this is a purely procedural error that doesn't affect the weight of the evidence presented? The essential problem, Your Honor, is that we don't know if those jurors understood those principles because they weren't asked whether or not they did. These are rock-bottom judicial principles, and we don't know if they understood them when they went back to deliberate. That's a major problem. Justice Carter found in the first case that the evidence was closely balanced. What is your position with regard to how that plays into your argument in this case? As far as our second argument, we would say that this Honorable Court is bound by that decision. As far as the first argument, I'll concede that's a little tougher argument to make, but we would argue that the difference... Yeah, I found the evidence in the first trial was enough to convict the person. Yes, you did. The second time around, our argument is that because of these flaws that we pointed out in arguments two and three, that the jury went back into that deliberation room as a flawed jury, and that's why their determination as to the credibility of those witnesses cannot be taken at face value. That's our argument. You've done a fine job of arguing the difficult case. Thank you. We appreciate you answering our questions. Thank you. Mr. Knitobik. Okay, I'm not even going to let you get started. How did this happen? Was it a different prosecutor? I know it was a different judge. It was a different county. It was the very same person that prosecuted the case. With all due respect, I'm not going to tell the Court what went through my mind when I read the record, because I did the case the first time. You did. I did the case the first time, the first appeal, and I have absolutely... I have no response from the Court. Is it the very same prosecutor that did both cases? I was wondering about that. We were hoping to blame the appellate prosecutor, maybe stepped in and tried the case. Not Justice Litton. I'm just astounded that... It's a very long, slow learning curve. Well, there's nothing I can say, because there was a special prosecutor in this case, and I believe he did try it both times, and he was from our agency. Oh, all right. And quite honestly, I... In dealing with this situation, something like this, I choose not to take in question trial counsel, only because I'm not a trial counsel, and so I don't take and try to judge people. You've answered my question. I've put you in a bad position. I apologize, but as a member of this Court, I wonder, what more do we need to say or do, and does it require reversing a murder conviction involving a very young child for prosecuting agencies to get this message about 431B? With that said, go ahead and begin your argument. Well, it's kind of interesting... Well, let me ask you these questions, okay? I know the arguments you make in your brief with regard to this closely balanced matter. Now, we found earlier this case was closely balanced, and we are not dealing with a second-prong issue. If it was a second-prong issue, I think Thompson clearly guides us in saying that it's not so fundamental that... It forecloses consideration of that. And the Supreme Court has never overruled Herron. And Herron, and you're aware of the language, and I'm quoting, If the defendant carries the burden of persuasion convincing a reviewing court that there was error, and there was error not doing it in the beginning, and that the evidence was closely balanced, the case is not cloaked with a presumption of prejudice. The error is actually prejudicial, not presumptively prejudicial. When there is error in a close case, we choose to err on the side of fairness so as not to convict an innocent person. Now, that's from the Supreme Court of Illinois. They have never rejected that language explicitly. They have never deviated from that standard in the first-prong issue. Now, you know, I have wondered if maybe in their Adams case or in White, they sort of deviated, but they really never explicitly said it. I mean, and the reason, this is a long question, but the reason I'm asking is I can't see the court deviating from the two prongs. I'm aware in White they sort of talk about the federal standard that was rejected earlier by Justice Fitzgerald, and they talk about Strickland, but it really doesn't apply to this area. And then in Adams, the error was closing argument error, and they found that there was error, and the way they avoided the first-prong issue is, as Justice Burke said, well, arguably it's closely balanced, but not really. So they never really rejected the closely balanced. So where does that leave you in a case like this when it's the same error that's coming up in the same case and the same witnesses, jailhouse snitches, and the language from the Supreme Court? The court says we're not going to second-guess and determine if this is prejudicial or not. We say it is. We're just going to err on the side of caution. Where does that leave you? Hopefully I'll be able to give a short response to that. I actually have two arguments with that. Number one, what's interesting in this case is the fact of, in a sense, how your prior decision is actually almost being appealed in this decision, because while I'm saying, hey, you know, public court, your ruling on the reasonable doubt was right on, but with all due respect were wrong on the 431B issue the first time around, because that was also a plain error, while defendants are arguing, public court, you made a mistake the first time on reasonable doubt, but you guys were right on when it came to the 431B. The Supreme Court didn't take this case. Well, we didn't. I didn't appeal it, and that's the second part of my argument. The reason why I didn't appeal that was not so much necessarily because I agreed with you, because with all due respect, I didn't, but there was a second issue in that case, and so the determination had to be made whether or not it was practical, reasonable, whether or not it was the best use of resources to appeal it, or to argue just the 431B knowing I was still going to take and lose and there was going to be a new trial anyway because of the other issue, because there was someone that testified that was improper to testify at that trial that this court found was error. So with that, the state decided not to do appeal it. So this case was never taken. What's interesting here is the fact that with plain error, in fact, when they say you have to find error, error has to be plain, and the error must have affected substantial rights. Well, what does that mean? That means prejudice. Now, how do you go about establishing that? Well, there's two prongs. One is closely balanced evidence, and the other is basically structural error. On the closely balanced evidence, what's interesting is, and Your Honor picked up on what I was trying to articulate in my brief, although I think you did a much better job, is the fact that when you look at that second prong, they say it's a clear and obvious error that may have affected the outcome of a closely balanced case. That is, was the evidence so closely balanced that the jury's guilty verdict was the result of the error and not the evidence? So when you take a look at that closely balanced evidence, the defendant says in his reply brief, hey, look, the state's wrong. We don't have to show prejudice to have plain error apply. We don't have to show that at all. All we have to show is error and closely balanced evidence, and since you guys already found that, the dead bang winner. That's the reason I started with Herron. Herron's exactly against what you're just saying. Herron's saying the error is actually prejudicial if it's closely balanced, not presumptively prejudicial. Herron says that, but then yet all the other Supreme Court cases that themselves rely on side Herron quote or say that that isn't so close because what they say is they say that the error, what they say is when we determine whether or not we're convicting an innocent person or we're convicting an innocent person because the jury was affected by the error and not the evidence, that the error convicted them rather than the facts. That's the second prong. No, that's the first prong. No, but those are the cases you're relying on. Aren't they mostly second prong cases that talk about that? No. Because there aren't that many Supreme Court cases that deal with the first prong. There aren't that many, but there's a plethora of appellate court cases that have, and they pick up on this language, and this language doesn't come from the second prong. Give me an example of a Supreme Court case, a first prong case, that rejects this Herron language or that implicitly rejects it. I would think Wilmington. Wilmington? Wilmington is a plain error case, and Wilmington is a first prong plain error case. And in Wilmington, they found that the evidence in that case was not closely balanced. Now, mind you, that was not a 431B case. Wilmington is, but the point is they found that it was not plain error, the evidence not closely balanced, which gets into another aspect of something. That brings me to what you stated first, and that is the first decision written by Justice Carter, my respected colleague, may dictate the outcome of this case in that he found the evidence was closely balanced. Can we now find on this record the evidence was not closely balanced because there were two additional pieces of evidence introduced by the defense in the second trial that would have made the scales, if we were just purely weighing facts, tip a little more in the direction of the defense. What I view as closely balanced and what my respected colleague may view as closely balanced may differ. My question to you is, can we differ? I think you can't. Why? I don't think, well, unless you're going to take and apply the doctrine of stare decisis and say that, well, you know, but that only would seem to apply with the rule of law, and this is a separate trial. It is now a new trial. To me, anyway, in my mind, the way I treated this was this was as though the first one never really existed. You have to look through all of the evidence for the facts, and I think... Let me go back to my first question because you still haven't answered it. Give me a Supreme Court case that deals with the first prong issue where they're rejecting that. Wilmington, I've got Wilmington up here. Wilmington says, we conclude the evidence was not closely balanced. So what they're looking at is the second prong. No, no, no. That's what it says. I know, but what do you mean? They say, the defendant does not argue otherwise. Instead, the defendant contends the reversal is indicated. This is the defense argument. By application of the first prong of plain error, i.e., that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. Then they say, Supreme Court, quote, like the appellate court, we conclude that the evidence was not closely balanced, and thus the first prong of plain error analysis is unavailable. Well, Wilmington is not a closely balanced case. Wilmington, the Supreme Court says, the case isn't closely balanced. So do you have a case that's a first prong where they find it was closely balanced as the first prong and they reject the Heron language? Oh, okay. I'm sorry. I know the defense argued that. No, no, no, no, no. I'm sorry. I misunderstood your question. Okay. I'm sorry. No, I don't have a first prong case where, again, when you say they've rejected Heron, okay, Heron has been interpreted by the Supreme Court in other first prong cases. Give me an example of that because I'm not aware of it. You know, I'm aware that, like in Wilmington, they said it wasn't closely balanced. And in Adams, Adams isn't quoted, I don't think, in the briefs, but Adams is a recent case from the Supreme Court. What I would have to do is I would have to go back to my brief and take a look because I'm sure that I cited nothing but Supreme Court cases when I got into this, and the Supreme Court cases I cited, especially for this proposition, would have come from that case. But, I mean, in Adams, what Justice Burke said was, and I don't have it in front of me, that arguably it was closely balanced, but not, and I'm paraphrasing, not really. So she didn't find it closely balanced either. And once you don't find it closely balanced, I think it's extremely hard in Illinois to find structural plain air. Okay. With all due respect, either I'm confused or I'm really not. The two prongs are really separate, and structural error simply talks about, structural error talks about the kind of error that is so fundamental that it strikes at the heart of the justice system itself. And we don't have that here. We definitely don't have that. But the whole thing is, this whole idea with the first prong. It boils down to whether this case is or is not closely balanced. Exactly. Justice Carter viewed the same facts in a number of cases in the second trial there was stipulated testimony pulled from the first trial. But the thing is, and this is where I want to go with this, because we had a discussion in the first case with respect to, well, you said, what you were saying is, you're saying that, thank you, you're saying that basically closely balanced was the same as reasonable doubt. And your Honor rightly corrected me on that. Okay. But if you take a look now at Wilmington, because at that time, there really wasn't much of a case out there that really dealt with, we know that closely balanced is not reasonable doubt, it's something different, but yet it was really never defined. If you take a look at what Wilmington did and how they assessed that there was no, this was not a closely balanced case. If you take a look at what they did, I think that that contradicts what your Honor did in the first case. And by that I mean, in our case here, the one thing that carries the day here, and it really establishes the crime, is the testimony of the two jailhouse snitches. They're the only ones that truly link any criminal activity to this defendant. But didn't the defendant also testify that it wasn't the mom? Well, the defendant testified that Eric didn't do anything and that mom did not injure the child. And there was only three adults in this child's life during that weekend. Well, if the defendant himself, and by the way, the defendant did not say, as was argued here, that he was unaware if Aaron did anything. He didn't say, I was unaware. He basically said, Aaron did not injure the child. If you factor that into the testimony of the two jailhouse snitches, which, by the way, they were never housed together. They were jailmates with this defendant on separate times. They come up with pretty much, when I say the same story, the same way that the injuries occurred, the same reasons. It seems to me that this is really not a closely balanced case. And I'm not talking about the weight of the evidence. I'm just talking about the nature of the evidence, that this evidence really is not as closely balanced as one might think. Well, you have the defendant and you have two jailhouse snitches. And, you know, when you bring up Wilmington, with all due respect, you know, I'm looking at Wilmington, and Wilmington, after they say this is not a closely balanced case, they give the reasons why. The reasons why they give do not sound like the case we've got in front of us. They say, first, although the jury sent notes to the judge, it does not appear anywhere in the record that the jurors themselves consider this a close case. The second, the testimony of the expert witnesses, expert witnesses for the state and defense, does not render this case closely balanced. And they say why. And then they say third. That's the important part. It's the why. Wait a minute. Third, there was unrebutted evidence. In this case, the defendant gave an inculpatory statement. And there was some physical evidence corroborating the statement. Physical evidence. We have that in this case, don't we? Okay. And they noted the defendant gave different stories. And while the defense expert testified the defendant's mild mental retardation and seizure disorder would have made it difficult for him to commit, also admitted the defendant's history of seizures were largely self-reported. You know, they've got more reasons why they don't think it was closely balanced. We have the same thing in our case. We have the same thing in our case. Don't we have basically a mouthful of confession by a defendant, albeit rather than to a police officer, to jailhouse snitches? Don't we have expert testimony that links what he says and what he says happens? Don't we have that forensic evidence that corroborates the kind of injuries that the victim sustained? To the jailhouse snitches? No, the forensic evidence. Okay, yeah. The forensic evidence corroborates what the jail's inmate said. And the only way they could have found out about it was from the defendant because they knew nothing else about the case. How else were they going to take and be able to take and say that it was because of math? How else were they going to be able to take and say because the little girl was going to snitch on me? How else are they going to find that out? They've got to find out from somebody that was there at the scene that did it. That's the defendant. But... Thank you, Your Honor. Oh, Mr. Boyd. Your Honor, it seems pretty clear that there was a 431B error in this case. It also seems pretty darn clear that the evidence in this case is closely balanced. I'd like to address a couple of points that counsel made about what Mr. Belknap said at trial. I don't have the record right here in front of me, so I don't have the exact quote. But I have addressed in my reply brief counsel's argument that the defendant somehow convicted himself at trial. It is not a good argument that Mr. Belknap certainly did not confess at trial. He did not convict himself. That is simply not what happened. And if Your Honors can take a look at that record at some point. I will. The record's in the building if you need to double-check it. It is here because we're all struggling with this case. We really are. My question to you is the defendant's version was the injuries occurred when the child fell on a trampoline. That's correct. Was that corroborated in any way? I mean, to me, that evidence, to be closely balanced, the defense theory has to be corroborated somehow. With all due respect, I'm not sure that's true, Your Honor. I think Your Honor's comments previously are important here. In the first case, this honorable court already decided that the evidence was closely balanced. And what we've got in this new trial is more evidence in favor of the defendant. So if it was closely balanced the first time, and Your Honors have already decided that it was, and we've got more evidence in favor of the defendant, then at a minimum, this case is closely balanced now. And as Justice Carter correctly points out, Heron is good law. Heron was good law in 2009 when Your Honors first decided this case. It's good law now. We've got a 431B error. We've got closely balanced evidence. There ought to be a new trial in this case. And I completely understand this is a horrendous case. This is awful, awful stuff. The law is the law. We have a 431B problem, a serious 431B problem. We have closely balanced evidence. There needs to be a new trial. I would also argue that Your Honors respectfully should think very seriously about reversing this case outright. These jailhouse hitches, as I've already explained, had lots and lots of motive to lie, plenty of motive. Both of these individuals could have received incredibly lengthy sentences. Their sentences were sliced by tremendous amounts. Numbers of charges on Mr. Eller's behalf were dropped. But to that aspect, two jurors have decided credibility. That's correct. But in this case, we also have the additional problem of the prosecutors injecting these inflammatory and sympathetic and emotional arguments in the closing arguments so that this jury walks into that jury room having already been presented with a very emotional set of facts and being further inflamed by the prosecutor's comments. And this jury that should have been able to dispassionately take a look at the facts in this case had been riled up by the prosecutor's comments and were likely no longer able to do that. We've also got some outright falses, some flat-out outright falses that are told by Mr. Burgess and Mr. Ellers. These guys weren't making jailhouse hooch. The jail guards clearly testified that these cells were inspected on a daily basis. There wasn't any hooch there. There wasn't any dare officer that talked to Sylvan. Sylvan wasn't punched in the face. So we've got jailhouse hitches with very, very strong motivation to testify falsely, and some of their testimony is verifiably false. That's the reason in this case, Your Honors, that I would respectfully ask that Your Honors take a very, very serious look at reversing this case outright. And I'd like to close by distinctly reiterating the relief that we're asking for. We are respectfully asking this Honorable Court to reverse Mr. Belknap's conviction outright because the evidence was insufficient. We're respectfully asking for this Honorable Court to grant Mr. Belknap a new trial based on the second and third issues we've argued, in particular the 431B issue. There's a clear 431B error, and there's clearly a case of close and balanced evidence. Unless there's any other questions. Thank you. Thank you. I would like to commend both attorneys for being well prepared. That's right. You handled some difficult questions from the court during this spirited discussion. This is exactly what oral arguments are all about because we only have one opportunity to ask you questions face-to-face. So I greatly appreciate it. I'm sure the court does, the level of preparation you brought today. Thank you. We'll be taking the matter under advisement and recessing for a panel change. The court now stands to recess.